CONSUMER FINANCIAL PROTECTION BUREAU
JOSEPH LAKE (CA Bar No. 246679)
joseph.lake@cfpb.gov
RENÉE ORLEANS (*Admitted Pro Hac Vice*)
renee.orleans@cfpb.gov
ADRIENNE WARRELL (*Admitted Pro Hac Vice*)
adrienne.warrell@cfpb.gov
1700 G Street NW
Washington, DC 20552

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>SYNAPSE FINANCIAL TECHNOLOGIES, INC.,<br><br>    Debtor. | Case No.: 1:24-bk-10646-MB<br><br>Chapter 11 Case |
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>    Plaintiff,<br><br>v.<br><br>SYNAPSE FINANCIAL TECHNOLOGIES, INC.,<br><br>    Defendant. | Adv. No.<br><br>**ADVERSARY PROCEEDING COMPLAINT** |

Plaintiff the Consumer Financial Protection Bureau (the Bureau) brings this action against Synapse Financial Technologies, Inc. (Synapse or Defendant) and alleges as follows:

**INTRODUCTION**

1. The Bureau consents to entry of a final order by the Court in connection with this adversary proceeding.

1

2.     Synapse offered and provided proprietary technology and software to nonbank fintech platforms that offered banking services to consumer end users (FinTech Platforms). Synapse's technology acted as a bridge between the FinTech Platforms that interfaced with consumers and the traditional banks that held consumers' money, issued debit cards, and processed ACH and wire transfers and other transactions (Partner Banks), pursuant to agreements between one or more of the banks and Synapse.

3.     In 2017, Synapse partnered with only one of the Partner Banks. As early as September 2023, Synapse's records did not match the records maintained by that bank, which was holding less money for the FinTech Platform end users than Synapse's records indicated the bank should be holding.

4.     Beginning in mid-2023, Synapse engaged with additional Partner Banks to offer FinTech Platform end users a Cash Management Program. As part of the Cash Management Program, Synapse directed the transfer of consumers' funds from the FinTech Platforms to more than one Partner Bank to hold those funds in an omnibus account held by a Synapse subsidiary for the benefit of the consumers. It also directed the movement of consumers' money to and from those Partner Banks to other Partner Banks that were originating and receiving ACH and wire transfers for consumers. Synapse was responsible for tracking and maintaining records of the movement of consumers' funds across these Partner Banks and ensuring those records matched the records maintained by the Partner Banks.

5.     In May 2024, after filing this Chapter 11 Proceeding, Synapse's operations deteriorated and eventually ceased, and it stopped providing data it had regularly provided to at least one Partner Bank and failed to maintain that bank's access to an online dashboard that provided information about consumer balances and transactions.

6.     After the Bankruptcy Court appointed a Chapter 11 Trustee, it became apparent that Synapse's records did not match the records maintained by multiple Partner Banks. The Partner Banks held significantly less money than Synapse's records indicated they should

1 collectively be holding. It took some Partner Banks many months to determine how much money
2 they should distribute to each consumer. During that period, thousands of consumers could not
3 withdraw or transfer any of the money they had placed with the FinTech Platforms, inflicting
4 significant hardships on those affected consumers. Consumers reported they were unable to pay
5 their rent or mortgage and feared they would lose their homes. Others reported they were unable
6 to afford food or pay for medical care or other bills.

7. Consumers did not have control over how Synapse moved or tracked funds across different Partner Banks that were holding their funds and processing their debit card, ACH, and wire transactions.

8. Because the Partner Banks held significantly less money than Synapse's records indicated they should collectively be holding for consumers, many consumers have not received the full amount they had deposited with their FinTech Platform.

9. Consumers were substantially injured because Synapse's records did not match the records of its Partner Banks. Consumers did not have any access to their money for weeks or months as Partner Banks reconciled their records with Synapse's records and then distributed funds to consumers. Over a year later, many consumers have not received the full amount of their account balance with their FinTech Platform.

10. Synapse engaged in unfair acts or practices by failing to maintain adequate records of the location of consumers' funds and failing to ensure those records matched the records maintained by the Partner Banks.

11. The Bureau brings this action under the Consumer Financial Protection Act (CFPA), 12 U.S.C. §§ 5564, 5565, to stop Synapse's unlawful conduct and obtain redress for affected consumers, a penalty, and all other appropriate relief.

**JURISDICTION AND VENUE**

12. This adversary proceeding relates to the Defendant's Chapter 11 bankruptcy case, pending in the United States Bankruptcy Court for the Central District of California.

3

13. This adversary proceeding is brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

14. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This adversary proceeding is a not a core proceeding but is otherwise related to a case under title 11. 28 U.S.C. § 157(c).

15. Venue is proper in this district pursuant to 28 U.S.C. § 1409.

**PARTIES**

16. The Bureau is an agency of the United States charged with regulating the offering and provision of consumer financial products and services under Federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau is authorized to initiate civil actions to secure appropriate relief for violations of Federal consumer financial law, including the CFPA. 12 U.S.C. § 5564(a)-(b).

17. Defendant Synapse is a Delaware corporation with its principal place of business in Woodland Hills, California that provided technology and other services to FinTech Platforms and Partner Banks.

18. The FinTech Platforms offered and provided consumers with financial services, including accepting and maintaining deposits accounts, transmitting consumers' funds to financial institutions, offering consumers debit cards and services, direct deposit, bill payment, and wire transfers. The FinTech Platforms are "covered persons" as that term is defined by 12 U.S.C. § 5481(6)(A), because they offered or provided a "consumer financial product or service" under the CFPA, by "engaging in deposit-taking activities, transmitting or exchanging funds, or otherwise acting as a custodian of funds or any financial instrument for use by or on behalf of a consumer" and by "providing payments or other financial data processing products or services to a consumer by any technological means." 12 U.S.C. § 5481(5)(A)(i), (15)(A)(iv), (vii).

19. At least one of the Partner Banks, Evolve Bank & Trust (Evolve), offered and provided consumers with financial services, including accepting and maintaining deposits

4

accounts, transmitting consumers' funds to financial institutions, offering consumers debit cards and services, direct deposit, bill payment, and wire transfers. Evolve is a "covered person" as that term is defined by 12 U.S.C. § 5481(6)(A), because it offered or provided a "consumer financial product or service" under the CFPA, by "engaging in deposit-taking activities, transmitting or exchanging funds, or otherwise acting as a custodian of funds or any financial instrument for use by or on behalf of a consumer." 12 U.S.C. § 5481(5)(A), (15)(A)(iv).

20. Synapse provided the FinTech Platforms and at least one Partner Bank with the technology and software that connected the FinTech Platforms (that interfaced with consumers) with the Partner Banks that accepted and maintained the deposits and provided other financial services. Synapse provided a material service to the FinTech Platforms and Evolve in connection with the FinTech Platforms' and Evolve's offering or provision of a consumer financial product or service by "participat[ing] in designing, operating, or maintaining the consumer financial product or service" and "by process[ing] transactions relating to the consumer financial product or service." 12 U.S.C. § 5481(26). Synapse is a "service provider" within the meaning of the CFPA. *Id.*

**FACTUAL ALLEGATIONS**

**A.    Synapse Provided FinTech Platforms and Partner Banks With Technology and Services That Enabled the FinTech Platforms and Partner Banks to Offer Consumer Financial Products and Services to Consumers**

21. Synapse offered proprietary technology and software to FinTech Platforms and Partner Banks. The FinTech Platforms provided a user interface through which consumers and businesses (End Users) could set up checking accounts and among other things, make deposits, transfer funds to and from other financial institutions, obtain debit cards, set up direct deposit and bill payment, and make wire transfers.

22. Synapse's technology and software created the link between the FinTech Platforms and the Partner Banks that held End User funds. Synapse's technology and software communicated the transactions End Users requested from the FinTech Platforms to the Partner Banks to perform.

5

23. Synapse performed these services for at least one FinTech Platform pursuant to a Master Services Agreement.

24. Evolve was a Partner Bank. Synapse executed a Bank Services Agreement with Evolve on or about April 18, 2017, and subsequently executed the Master Bank Services Agreement on or about September 23, 2022. At least until the summer of 2023, when a consumer opened an account with a FinTech Platform, Synapse provided the consumer with a deposit account agreement on behalf of Evolve.

25. At least as of September 2023, if not earlier, both Evolve and Synapse were aware that there was a deficit of tens of millions of dollars in funds that Evolve was holding for End Users, which included consumer funds. Evolve and Synapse have publicly blamed each other for the deficit.

26. As of the date of the filing of this complaint, Synapse has not resolved its dispute with Evolve regarding the deficit.

**B.    Beginning in mid-2023, Synapse Offered a Cash Management Program to Consumers Through Synapse Brokerage**

27. Synapse Brokerage LLC (Synapse Brokerage) is a wholly owned subsidiary of Synapse and a registered broker dealer.

28. In 2023, Synapse began to offer a Cash Management Program through FinTech Platforms. Synapse marketed its Cash Management Program as a way for FinTech Platforms to offer their end users increased FDIC deposit insurance through Synapse's sweeps program and partnership with multiple banks. FinTech Platforms with an existing relationship with Synapse could choose whether to participate in Synapse's Cash Management Program. As part of the Cash Management Program, Synapse opened accounts with Synapse Brokerage on End Users' behalf and one or more omnibus accounts at Partner Banks in the name of Synapse Brokerage for the benefit of End Users.

29. When some End Users deposited funds through the FinTech Platforms, the deposit was initially held in the Synapse Brokerage account and then transferred by Synapse Brokerage to omnibus accounts at the Partner Banks. When End Users sought to withdraw funds, Synapse Brokerage would facilitate the withdrawal of the funds from the omnibus accounts at the Partner Banks.

30. Synapse had arrangements with several Partner Banks for the Cash Management Program.

31. AMG National Trust Bank (AMG) was one of several Partner Banks for the Cash Management Program. It accepted sweeps deposits from Synapse Brokerage beginning in August 2023 and held those deposits in the name of Synapse Brokerage. It also processed ACH and wire transfers for End Users with some FinTech Platforms that chose to participate in the Cash Management Program.

32. Evolve was not one of the Partner Banks Synapse engaged to hold funds in the name of Synapse Brokerage on the End User's behalf for the Cash Management Program. Beginning in October 2023, for FinTech Platforms that chose to participate in Synapse's Cash Management Program, Synapse directed the transfer of End Users' funds from Evolve to Synapse Brokerage and then to accounts at other Partner Banks.

33. Some FinTech Platforms did not participate in Synapse's Cash Management Program and their End Users' funds remained with Evolve.

34. Even for End Users who moved to Synapse's Cash Management Program, and whose funds therefore had moved to Synapse Brokerage accounts at other Partner Banks, Evolve continued to act as a Partner Bank by providing access to certain banking products and services, including by continuing to sponsor debit cards. Evolve also continued to act as the receiving bank for ACH transfers for which consumers had previously been using Evolve's routing number, such as direct deposit. Evolve continued to maintain accounts on behalf of these End Users to provide these services. Synapse would sweep funds from those accounts to Synapse Brokerage.

35. Lineage Bank (Lineage) was also a Partner Bank. It primarily provided payment processing services as an originating bank. When End Users in the Cash Management Program sought to make ACH and wire transfers, Lineage processed those transactions based on instructions from Synapse.

36. After the introduction of the Cash Management Program, Synapse's technology continued to create the link between the FinTech Platforms and all Partner Banks and to communicate the transactions End Users requested from the FinTech Platforms to the Partner Banks.

37. Synapse was also responsible for directing the movement of End User funds from Synapse Brokerage to and from (1) AMG and other Partner Banks that held End User funds in omnibus accounts; (2) Evolve, which continued to process debit card transactions and to act as the receiving bank for ACH transfers; and (3) Lineage, which was originating ACH and wire transfers based on instructions from Synapse.

38. Synapse was also responsible for tracking the location of individual End User funds across Synapse Brokerage; AMG and other Partner Banks that held End User funds in omnibus accounts; Evolve; and Lineage. Synapse additionally was responsible for providing the banks access to data and records regarding End User activity.

**C.    Synapse Files For Chapter 11 Bankruptcy**

39. On April 22, 2024, Synapse filed for Chapter 11 Bankruptcy protection as a debtor in possession. At the same time, Synapse sought court approval of an asset purchase agreement with a potential buyer that would have transferred all of Synapse's business operations to the buyer. At that time, Synapse and Evolve had not resolved their dispute about the deficit in the account balances at Evolve. The buyer required Synapse and Evolve to come to an agreement and ensure that the account balances at Evolve were fully funded as a condition of the purchase.

40. Synapse and Evolve could not resolve their dispute.

41. On May 11, 2024, Synapse failed to maintain Evolve's access to an online dashboard it maintained through which Evolve could access certain information about End Users' accounts at Evolve, including current balances and transactions.

42. Synapse also stopped providing Evolve general ledger reports, which it had previously provided to Evolve daily.

43. On May 11, 2024, Evolve stopped processing transactions and instituted a freeze on any activity for any End User.

44. Lineage also stopped processing transactions and instituted a freeze on any activity for End Users.

45. As a result, consumer End Users could not use their debit cards, withdraw or transfer their funds, pay bills, or receive deposits, including direct deposits of their wages and salaries.

46. On May 15, 2024, the United States Trustee filed an emergency motion to convert the case to a Chapter 7 under 11 U.S.C. § 1112(b) or direct the appointment of a Chapter 11 Trustee under 11 U.S.C. § 1104(a).

47. On May 17, 2024, Synapse provided Evolve, AMG, Lineage, and other Partner Banks with Synapse's records regarding the amount each bank was holding for each End User.

48. On or about May 17, 2024, Synapse provided Evolve with the general ledger report for May 15, 2024.

49. On May 24, 2024, the bankruptcy court appointed a Chapter 11 Trustee.

**D. Consumers were Substantially Injured Because Partner Banks' Records Did Not Match Synapse's Records**

50. With the assistance of the Chapter 11 Trustee, the Partner Banks determined that the total amount of funds all the Partner Banks were holding for End Users was less than the total amount of End User funds reflected in records Synapse provided to the Partner Banks. The Trustee has estimated this shortfall of End User funds is between $60 and $90 million.

51. Evolve determined that its records for End Users of FinTech Platforms that chose to participate in Synapse's Cash Management Program were not consistent with the records provided by Synapse on May 17, 2024. Evolve engaged a third-party consultant to help it reconcile and confirm account balances using its own records, Federal Reserve Bank records, and information and records made available to it by the Chapter 11 Trustee.

52. Upon reviewing the records provided by Synapse on May 17, 2024, Lineage determined that its records were not consistent with Synapse's records. Lineage engaged a former Synapse employee to help it reconcile and confirm account balances using its own records, Federal Reserve Bank records, and information and records made available to it by the Chapter 11 Trustee.

53. AMG began to distribute funds to End Users of FinTech Platforms beginning in May 2024. Evolve and Lineage began to distribute funds in June 2024. The Partner Banks most recently reported in March 2025 that they continue to distribute funds, mostly for accounts with very low balances that do not have valid addresses on file and for returned payments.

54. To date, distributions from Partner Banks collectively have not provided many consumer End Users the full amount of their account balance with their FinTech Platform as of May 17, 2024.

55. Even consumer End Users that did receive distributions from the Partner Banks, could not withdraw, use, or transfer those funds until the Partner Banks had completed their distribution, which took over eight months in some cases.

56. Before the distributions were completed, some consumer End Users reported they lost all or most of their life's savings. Many reported they were unable to afford food or pay their rent, mortgage, hospital bills, or other bills without access to their funds. Some consumer End Users were also forced to pay late fees and other penalties because they did not have access to their funds to timely pay bills. These hardships caused certain End Users emotional distress, including some who expressed suicidal ideations.

57. Consumers did not have control over how Synapse moved or tracked funds across different Partner Banks that were holding their funds and processing their debit card, ACH, and wire transactions. As a result, consumers could not reasonably avoid the harm they suffered.

## CAUSE OF ACTION

### Count I – Unfair Acts or Practices

58. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

59. Section 1036(a)(1)(B) of the CFPA prohibits service providers from engaging in "any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B).

60. An act or practice is unfair under the CFPA if (1) the act or practice causes or is likely to cause substantial injury, (2) which is not reasonably avoidable by consumers, and (3) such substantial injury is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c).

61. Synapse engaged in unfair acts or practices by failing to maintain adequate records of the location of consumers' funds and failing to ensure those records matched the records maintained by Partner Banks.

62. Consumers were substantially injured by Synapse's acts. Consumers did not have any access to their money for weeks or months as Partner Banks reconciled their records with Synapse's records and then distributed funds to consumers. Many consumers have not received the full amount of their account balance with their FinTech Platform.

63. Consumers could not reasonably avoid the injury caused by Synapse's actions as they had no way of knowing that the account balance reflected on their FinTech Platform did not match the balance reflected at Partner Banks, or that they would lose access to their funds

while the Partner Banks reconciled their records with Synapse's records. There are no countervailing benefits to consumers or competitors from Synapse's actions.

64. Thus, Synapse engaged in unfair acts and practices in violation of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a), (c), 5536(a)(1)(B).

## **REQUEST FOR RELIEF**

Accordingly, the Bureau requests that the Court:

a. permanently enjoin Defendant from committing future violations of the CFPA;

b. grant additional injunctive relief against Defendant as the Court deems just and proper;

c. award such relief as the Court finds necessary to redress injury to consumers including, but not limited to, rescission or reformation of contracts, refund of moneys, restitution, and payment of damages or other monetary relief;

d. impose on Defendant civil money penalties under 12 U.S.C. § 5565(c); and

e. award additional relief as this Court deems just and proper.

DATED this 21st day of August, 2025.

Respectfully Submitted,

Michael G. Salemi
*Principal Deputy Enforcement Director*

Deborah Morris
*Assistant Principal Deputy Enforcement Director*

Michael P. Favretto
*Assistant Litigation Deputy*


/s/ Joseph Lake
_____
Joseph Lake
(CA Bar No. 246679)
(202) 897-8360
joseph.lake@cfpb.gov

Renée Orleans
(MD Bar)
*Admitted Pro Hac Vice*
(202) 435-7271
renee.orleans@cfpb.gov

Adrienne Warrell
(NY Bar No. 5361092)
*Admitted Pro Hac Vice*
(202) 435-7189
adrienne.warrell@cfpb.gov

*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Facsimile: (202) 435-7722

For the Consumer Financial Protection Bureau